Good morning, Mr. Lieberman, whenever you're ready. I'm ready. Good morning, Your Honors. I'm Jeremy Lieberman, Pomerantz LLP, on behalf of Appellants. Your Honor, plaintiffs submit that the District Court committed a reversible error by dismissing three categories of misstatements in this action. One deals with whether or not there was an actual contract signed between K12 and Miami-Dade. The other is the capabilities of the company and the capacity of the company to implement the Miami-Dade contract and other similar contracts. And the third is their ability to counteract cyber hacks and cyber breaches. With respect to the Miami-Dade contract, the company said very clearly and unambiguously, there's a contract with Miami-Dade. They said that on August 11, 2020, and they made it very clear. They discussed their work with Miami-Dade. They said there's a contract. Well, they were working with Miami-Dade. That's not under dispute, is it? That's true, but they use the word contract. And that's very important, whether or not you have a contract or not. And Barrington Investors clearly took the statement, which discusses a contract, and said there is a signed contract between Miami-Dade and K12. And then you have William Blair saying this is a contract win. The difference between someone doing work for somebody and somebody having a legally binding contract under the law is obviously material. You have, and even in particular here, I thought, excuse me, counsel, I thought they were just saying that K12 was working on an agreement with Miami-Dade. I don't think that, where did they say that Miami-Dade had countersigned anything? Your Honor, they say we see increased reference. Can you finish the JA reference, please? I'll have to get you. So we're all on the same page, so to speak.  191, Your Honor. What? 191 is paragraph 22 of the consolidated medical complaint. Okay. Okay. And he says in paragraph 92, which is, he says, we are seeing an increase, however, in school districts who call us and want to use our context and our curriculum with more of those contracts this year than we've ever had in any one of the year before. I mentioned Miami-Dade. There are others we are working on. There's a clear distinction. They've got a Miami-Dade contract, and they're working on other contracts. I mean, that's one interpretation. Another way to say it is we're working on Miami-Dade, and there are others that we're working on. Well, no, because what they say is they have, they mentioned Miami-Dade. There's others they're working on, not yet disclosed, that they're still, that there's Miami-Dade, and there's others that they are working on. The market, obviously, Your Honor, we can debate what it was meant and how it should be interpreted. The market clearly interpreted that this was a contract that was signed. Barrington Research said, signed contract. William Blair says, signed contract. And this circuit is clear. It's not what the speaker's intent is. It's not what this court might interpret these words to be. It's what the market interprets these words to be. Well, wait, I certainly understand that when it comes to whether something is material, the primary instinct is what the market would or likely did. Have we said that we let counsel's argument about the market decide whether the statement was false or not? Whether it's misleading, yes. Okay. Whether the statement is misleading to an investor, the market decides that. Clearly, the market has decided. Barrington Research said, signed contract. William Blair says, signed contract. There could have been a correction the next day by K-12 and said, hey, guys, we know you thought it was signed.  They never went ahead and tried to correct the market. And that's particularly important here because there not only was it not signed, they were not paid. It's very nice if someone goes to my windshield and starts scrubbing and says, well, I work for Mr. Lieberman. He's got a great car over there. I scrub his windshield. I never paid him. I never signed him. Was the contract included in Miami-Dade's school board reopening plan? And that's what your opposing counsel says, that they actually said that they were providing services to Miami-Dade. And the fact that Miami-Dade later became dissatisfied with the quality of those services was that may be a future event. But at the time that the allegedly misleading statements were being made, weren't they providing services to Miami-Dade? And didn't Miami-Dade include the so-called contract or whatever in the school board's reopening plan? I mean, things were pretty far along. There may have been discussions, but when you don't have a signed and executed contract, we're all lawyers here. That's clearly a material fact, particularly when they had not yet been paid yet. And not having a signed contract actually made it much easier for Miami-Dade to ultimately not pay them. There's nothing on the record that says that K-12 ever made a dollar on these services because there simply was not a signed contract. And that's even more important when there had been a $1.57 million payment to the superintendent, to his charity, at the same time that there is an unsigned contract hanging over the head of K-12. Can I go back to something you said in response to one of my earlier questions? What authority from the Supreme Court or this court says the market decides whether something was misleading? Sure. Your Honor, Paradise Wire and Cable Defined Benefit Plan v. Weill, 918F312, quote, whether a statement or omission is materially misleading depends on the perspective of a reasonable investor. Wait, wait, wait. Whether a statement was materially misleading depends on the perspective of a reasonable investor. And that makes total sense, that materiality is all about what the market does or doesn't care about. It says materially misleading. What authority do you have for the proposition that whether a statement was false or misleading at all is determined by the market? Your Honor, then I would say to Burson v. Applied Signal, a Ninth Circuit case, 527F3, 982. And the question is whether or not the statement gave a reasonable investor the impression of the state of affairs that differed in a material way from the one that actually exists. It's the perspective of the investor, not this court. But it's the perspective of the hypothetical reasonable investor, like the reasonable person in court, not some, here's a document that shows what someone may have misinterpreted it as saying. Your Honor, two analysts who were covering the company and with the stock price going up are saying that there's a signed contract. There is no signed contract. They're not even getting paid for their work. And there's a $1.57 million payment made to the superintendent while that contract has not been signed. And the work has ultimately been rejected and unpaid for. To say that all that bears upon whether or not there's an executed contract. And to be in a scenario where we have evidence that the market interpreted this to be a signed contract, where we all know what the importance of a signed contract is under law, and to say that this is just some immaterial fact to investors at this stage of the pleadings, we think that would be inappropriate. And there is no discussion of these facts and these details in the court's order. It's simply, the court said, it's just to generalize the allegations. Very specific allegations as to whether or not... One question I had was whether the Securities Litigation Reform Act and the tele-ads case, which seemed to speak to a pleading standard, they required that the culpable, that the fraudulent explanation be, with respect to Sienta, be as compelling as a reference of non-fraudulent intent. And I'm just wondering, given the fact that these negotiations between these two parties had at least proceeded a good way down the road, even if the ribbon hadn't been tied up at the end, after the tele-ads case, is the inference of Sienta as cogent and compelling as a non-fraudulent interest, given the fact that they have had an extensive series of dealings that Miami-Dade was utilizing services of K-12? I mean, it just seems to me that it's a more difficult case to press after tele-ads and the standard announced by Congress in the Securities Litigation Reform Act. Your Honor, we do think that under tele-ads, the inference is a culpable inference and it has to be just as compelling. The tie goes to the plaintiff on whether or not there's a culpable inference or a non-fraudulent. It's here that not only was there an unsigned contract, First of all, Davis admits that he knew the contract was not signed. He admits that in his testimony to the OIG or his statements to me in the OIG report. So when you have someone making a knowing false statement, right away, you get that inference of Sienta. But even let's look at the facts around it. You've got an unsigned contract with a $1.57 million payment made to a private charity or the personal charity of the superintendent. And there's no sign. Kind of clearly, one can make the inference is that that was being done to induce the signature of that contract. And so when you look at that in context, that A, Davis knew it was not signed. That's right away. That should be game over under Singer v. Riali. When you know you're making a statement and you know it's undercut, that it's false and misleading, and you know about the adverse facts that undercut that statement, the wind goes to the investor. That's one. In evaluating Sienta, one of the things you look at, I think, is whether the defendants personally profited from any kind of misleading statements. And did any of the defendants unload their stock during the relevant period? Did they personally benefit in some way through a sale of stock motivated by information that they hadn't really signed, hadn't really finalized a contract? I mean, was there a personal benefit in this for them? Your Honor, the benefit was that this was a turnaround plan for the company. And for the company to get a stock price from minus 57 percent  Did the representation cause a rise in the share price that defendants took advantage of by selling the shares? I'm just asking you informationally. If there was a sale of shares right before the termination of services took place, did they sell them? No, Your Honor, they did not sell. But TELABS is clear, and other circuit courts are clear. That is one way to make a culpable inference. The other way is knowledge of the falsity of the statement, and we plead that here. And the other way is other factors that show a culpable intent, particularly the $1.57 million unprecedented donation by K-12 to the person... Counselor, all I'm asking you is whether it's relevant that they did not. Presumably, your theory is that the contract caused the price of the stock to rise. At least it seems to me relevant whether they profited from that by unloading some of their stock or selling some of their stock. Is there any of that self-dealing? Is there any of that self-dealing? Your Honor, there's no allegation of insider sales. We would submit based upon TELABS, based upon fourth circuit precedent. That's simply not required. We didn't have that. Isn't it relevant? What's that? Isn't it relevant? You'd have a much stronger... It could be one of the factors. I mean, there's a number of factors you could... One of them is knowledge of falsity. We've pled that. I understand. Excuse me. I'm just saying you do admit that this is definitely one of the factors. Your Honor, it's a factor considered by the courts. It's a factor considered by the courts. Motive and opportunity is a factor considered by the courts. There are some other areas of falsity. I could address them on rebuttal or I can handle them now. You've got some rebuttal time, Counsel. All hands on deck. Thank you. Mr. Wald, I think it's your time up. Thank you very much, Your Honor. Peter Wald, Latham & Watkins on behalf of the appellees. I think I'd like to start and give Mr. Lieberman's address. Can you kindly speak up for me, please? Is that better? That's better. Thank you so much. Thank you. I think I'd like to start with two things. The actual language of Mr. Davis' statement, which has been challenged. And also a timeline of the events, which I think really helps to put all of this into perspective.  Mr. Lieberman quoted from paragraph 43, which is at JA-21. And it concerns the August 11th statements. There are two of them challenged in the complaint. The first paragraph is statement 13. As for school districts, more and more of them now plan to use online learning as an alternative to in-person classes. One such school district is Miami-Dade County Public Schools. A district we've had a relationship with for more than a decade. First of all, nothing in that preliminary paragraph says anything about a contract, let alone an executed contract. Second of all, nothing in that paragraph is false or misleading. Miami-Dade and K-12 had a very rich and successful history working together for over a decade before the pandemic. Then if you go down to the last paragraph under the ellipses, this is statement 15. What does Mr. Davis actually say? He says, quote, we are seeing increase, however, in school districts who call us and want to use our content and our curriculum. With more of those contracts this year than we've ever had in any one year before, period. I mentioned Miami-Dade, comma, there's other we're working on, comma, not yet disclosed, but maybe not as large as Miami-Dade. Mr. Davis does not say. I think the plaintiff's counsel is not saying that this was outright a misleading statement. The plaintiff's appellant's counsel seemed to me to be saying it's implied that a contract may not have been, may not have said we have a contract. But Mr. Lieberman's argument was that, well, true, but it's implied. What do you say in response to that? I think what is implied, Judge Wilkinson, by the statement is that the parties were working together with an understanding that Miami-Dade was going to purchase K-12's products and services. I don't think there's anything here which implies that he said that there was an executed contract. There was one analyst who talked about a contract. William Blair did not say, contrary to Mr. Lieberman's statement, that there was an executed contract. But I think what's important is to understand the background of Statement 15. And I'd like to put into the record the following timeline with Your Honor's permission. On July 6, 2020, the Florida Department of Education issued guidance on educational requirements for the 2020-21 school year. That's a JA-478. Miami-Dade immediately saw a Temporary Learning Management System, LMS, provider. The OIG report found that Miami-Dade held off developing the specifications of the Temporary LMS, pending the publications of the state's guidance to Florida school districts regarding the educational requirements and funding for the 2020-21 school system. So they were behind the eight ball. That's a JA-478. Between July 6 and 10, 2020, the OIG report says the following. Within days of the Florida DOE guidance, Miami-Dade began contract negotiations with K-12 and began the process of trying to set up the platform, integrated systems, trained personnel, and roll out the Temporary LMS in time for the first day of school. That's a JA-484. And the first day of school, Your Honor, was August 31. Is your position stronger on Cienter than on Falsity? Your Honor, I don't believe, well, I do believe that our position on Cienter is compelling. And to use the framework from Telabs, there were no stock sales, as Your Honor pointed out. And there were no stock sales at all. That's important to me, as to whether there was a rise in the price of the stock that the defendants took advantage of with a sale of shares to their personal enrichment. That makes this a totally different case. And Mr. Lieberman concedes that there is no such allegation, Your Honor. He tries to substitute for it a sinister spin to the donation that was made. That was the subject of the OIG report. And as Your Honors know, the OIG report found no wrongdoing. So, on July 10, Your Honors, K-12 and Miami-Dade reached an agreement on price and began to draft the agreement. That's at JA-489, the OIG report. On July 29, the Miami-Dade administration, at a special meeting of the school board, advised the board of its intent to use elementary and secondary school relief funds for the purchase of the K-12 temporary LMS. That's at JA-487 and JA-347. On July 30, the next day, Miami-Dade submitted its reopening plan to Florida DOE, signed by the superintendent, Mr. Carballo. That's at JA-381.  The district is supplementing the resources provided to classroom teachers with a full complement of Florida-specific, FDOA-approved digital courses provided by K-12 Florida. On August 10, 2020, K-12 signs the contract. That's at JA-394. The next day, on August 11, Mr. Davis makes the statement, Statement 15, that the plaintiff's allege was false and misleading. He certainly doesn't say much, if at all, about a contract. He certainly doesn't say that the contract had been signed the day after he signed the contract by the superintendent. On August 21, according to the OIG report, so now 10 days after the statement had issued, Superintendent Carballo, for the first time, became concerned about reports that he was receiving from his staff and decided to void and forbid the release of a contract with his electronic signature affixed to it. And I forgot an important date, Your Honors. On August 17, Superintendent Carballo countersigned the contract. He didn't return it to K-12, but there's no question that he countersigned the contract. That's at JA-394. He advised on August 21 that the contract should not go out unless it had his original ink signature. And he believes that after he told his staff not to send it out, that they then added void to all pages of the report. In the period August 21 to 24, Superintendent Carballo continued to receive reports of growing concerns regarding the statement of work and deliverables following a series of Zoom meetings with K-12 and Miami-Dade staff. That's at JA-490. On August 25, the Miami Herald quoted the school board vice chair as saying, quote, there are areas of planning and execution relative to training and new systems that fell below the expectations we set as a board and for which employees and parents look forward. That's JA-40. The next day, CBS Miami article quoted the teachers union president as saying, quote, the training for K-12 has been ineffective. That's JA-41. And on August 31, there's the first day of school. Just a couple of more dates that we think are important for the court. On September 2, Miami-Dade School Board convenes a meeting where it's allegedly revealed that Superintendent Carballo never signed the $15.3 million no-bid contract with K-12. The OIG report indicates that in their interview with Mr. Davis, he said that he found out about the non-signature sometime before the start of school. So he makes statement 15 on August 11, he finds out that it wasn't countersigned sometime before August 31. Not that they intended to walk away from it, just that it wasn't countersigned. There's no allegation as to when that occurred, but the reports of problems don't begin to surface until August 21 to August 26. On September 5 or 6, according to the OIG report, Mr. Carballo communicated the concerns and the decision to discontinue the service for grades 6 to 12 to Mr. Davis. That's according to the OIG report, September 5 or 6, that's at JA-502. And on September 10, the Miami-Dade School Board voted to terminate the $15.3 million contract with K-12. Those are the facts in the record. None of that, Judge Wilkinson suggests, that when Mr. Davis spoke on August 11, the day after he signed the contract, that he made a material misstatement about the state of affairs. He did not say that there was a fully executed contract, he did not talk about a contract, and he did not imply that. What he did imply was that the parties were working in good faith and at record speed to try to be ready for the August 31 opening date. And there's no dispute in the record. The OIG report is clear that Miami-Dade and its officials were completely involved in that and were working side-by-side. What you're saying is that what you have here is not something that was manufactured out of the blue or whatever, but that there was an extensive working relationship and history of negotiation between the parties. And that one of these parties had a track record in serving schools with this kind of remote education, and that Miami-Dade was definitely interested, and that they actually, I think they referred to it in their reopening plan. But these are people that are working in a mutually, and what they hope will be a mutually beneficial relationship. And your point, as I understand it, is that that's not enough to make a compelling, to draw a compelling inference of Sienter that the innocent explanation is at least on a par with any kind of culpable explanation. That's sort of in a nutshell where you are, isn't it? It's a very good summation, Judge Wilkinson, and we certainly agree with that. I would add to it that the facts that I've just recited are incompatible with the claim of misrepresentation, given the actual words that Mr. Davis used. There's no question that there was a contract on August 10th. There's no question that he signed it on August 10th. He makes his statement on August 11th. As I indicated previously, the school board had already advised of its intent to purchase and use K-12's temporary LMS. That's at JA-487 and JA-383. And that's at the end of July. So to say that they're working on something with Miami-Dade on August 11th, with everything that he knows, there are no facts alleged that would render false and misleading the actual statement that Mr. Davis made on August 11th. Now, certainly it's true that problems arose after that. And certainly it's true that the school board voted to terminate the contract on September 10th, weeks after Mr. Davis spoke. But the fact that you have a subsequent event, which alters the course of the party's relationship, does not mean that what was said on September 11th was false or misleading. And Judge Wilkinson, because I know you're very focused on the Siena issue, I do think that it's important to note this court's decision in McGuire Financial. Because even if you could say that Mr. Davis knew that what he was saying was not technically correct to use the language of that case, and for all the reasons I've said, I do not believe that there is any basis to so conclude on this record. Well, I think what you're suggesting, it seems to me that if the fall in Siena, there's an interrelationship. But if something is not false, it becomes almost very, very difficult to prove Siena with a statement that was not false. But just assuming, even if we were to assume that he made a statement, which you say he did not make it, he never made it, there was a contract. There's still a Siena is still a higher bar. Even if there was a false statement, you have to show a culpably false statement. So while there's a relationship between the two, there's also, it seems to me, based on tele-abs and based on Congress's legislation, the Siena is still something in addition that has to be tackled. That's absolutely correct, Judge Wilkinson. And the court in McGuire made that point. And if I may, I just want to read this for the court's benefit on page 548. The PSLRA reflects Congress's determination that liability for securities fraud should not be predicated solely on an overly optimistic view of a future which may, in fact, encounter harsh economic realities down the road. McGuire Financial must show that Hinton affirmatively sought to advance or calculatedly sought to obscure that reality. The inference that Hinton may have knowingly misspoke alone does not do so. So even in a situation where the court was willing to entertain the notion not only that he misspoke, but that he knowingly misspoke, or at least knew that there was a technical incompatibility in what he said, even that is not sufficient to show Siena. And, Your Honors, that's consistent with the discussion that this court engaged in in Cozzarelli, where the court noted that it would have been crazy, my word, not the court's. It would have been crazy for the pharmaceutical company to tout a clinical trial that it knew was going to fail, where the plaintiffs had alleged that the clinical trial was the most important product in the pharmaceutical company's line of products. Why would you tout something that you know is going to fail? Why would Mr. Davis tout the Miami-Dade relationship on August 11th if he knew that it was going to fail two weeks later? It makes no sense. And to the tele-app's point, Judge Wilkinson, that's why the inference that Mr. Lieberman would have you draw is neither cogent nor compelling and certainly not as compelling as the innocent inference. Thank you. Thank you, sir. Mr. Lieberman, you have some rebuttal time that you've reserved. Yes, thank you, Your Honor. To address a few of Mr. Wald's comments, first of all, as far as the OIG report, the OIG concluded that there's no doubt that this solicitation for gifts totaling over $1.5 million on the eve of the temporary K-12 LMS go-live with an unsigned contract hanging over it created the appearance of impropriety. Whether they made a formal finding of censure or sanction, no, but it created the appearance of impropriety. Why is K-12 giving $1.5 million to the personal charity of the superintendent when there's no signed contract yet? And at least tell investors that you're doing so when you're discussing this contract. But what I would look at, Your Honors, is that even Mr. Wald's recitation of the facts demonstrates the importance of whether or not you have a signed or unsigned contract. Mr. Corrello looked at the contract purposefully, waited on the execution, waited on the transmittal of the contract because he knew that this had legal import. He knew that this impacted the school district's liability and duty to make payment on this work. And therefore, he held back on making a formal signature, and he held back on sending that signature back to K-12. That shows exactly the importance of whether or not a contract is signed versus unsigned. I find it funny and I find it interesting where you have a scenario where there's an unsigned contract, but we're all aware of it. We know how important signing a contract is. An unsigned contract is not binding. A signed contract is binding. So all that is quite important. We didn't have a chance on my opening remarks to discuss the other avenues of liability and falsity. At the same time that there was no signed contract, K-12 was making statements regarding how it was servicing Miami-Dade and it was able to service similarly large school districts in addition to Miami-Dade based upon its technological capacities. At the time that the company is touting its capacities, you have CWs and you have internal comments made to the executives of K-12 saying you don't have the ability to go ahead and execute this contract. You're doing this in six weeks. It's going to take you six months. According to CW1, it was going to be $6 million. They were advised, Davis was advised that it would be a $6 million investment to get K-12, to get Miami-Dade up and running. That was impossible to do in a six-week time span. That was never. At the same time the company was touting the contract? What you alleged to be the misleading statement. Isn't that another factor, the fact that the relationship collapsed? He had no idea before August 11th that the things weren't going to work out and a lot of businesses don't. What the Miami-Dade's disappointment, it seems to me, occurred after the statement that you take issue with. That would make it, it seems to me, a different case than Mr. Davis knowing beforehand that the relationship was not going to pan out. As I read the record, both parties, as of the time of the statement, were optimistic that a fruitful relationship would materialize. But Your Honor, that's not supported by the record. The allegations of the complaint make clear that Davis was warned internally by other executives and by other personnel in K-12 that this contract could not pan out. They could not get themselves ready in six weeks to support and service 270,000 students. They didn't have the capacity. Total view did not work. The video did not work. They did not have the bandwidth. That's testimony by CW1, that's testimony by CW3, CW4, and CW5. And so the testimony in this action is that and the allegations are that the company simply never had the bandwidth to support a 270,000 students district. And those allegations need to be uncredited. They are on the record. And they say that Total View, the main operating software proprietary, did not work, did not function, could not support 270,000 students. You have others saying that the training was completely and wholly inadequate. CWs 4 and 6 make this testimony. You know, every kind of business relationship, contractual relationship, whether it be construction or school services, they very often encounter bumps along the road. And the parties, sometimes they can't work it out. But other times, you know that they they are. This was a situation where the parties were hopeful. But I've never seen one of these contracts that over a period of time didn't encounter some glitches or bumps. And you try to work that out. Your Honor, it's not bumps on the road. The card didn't work. K-12 simply didn't have the capacity to support 270,000 students. You have Buford County the same exact time saying that the systems did not work, that they did not have the bandwidth to support their school district. You have CW-5 saying that the Tennessee Virtual Academy also didn't have, K-12 did not have the bandwidth to support the school district. You have K-12 simply cannot get the work done that they're purporting that they can get done. And they're making statements at the time that they're implementing this contract that we are servicing K-12. I hear what you're saying, but it's also true that K-12 did have a track record in this field. It was servicing a large number of over 1,000 school districts. I know what your response is, that there wasn't any, this was larger than those other 1,000 school districts. And, you know, I hear that, but they're not, you know, they do have a track record, or at least they have experience. But at any rate, your time is expired. Go ahead and make a concluding statement, counsel. No, Your Honor. They never had a track record for a county like this. There are multiple internal warnings saying that the company could not handle the contract. On his own, Davis reflects and says, I knew it was a risk. I couldn't get it done in six weeks. And it was going to, it likely would have taken six months. He knew about the risk, but he didn't tell investors that there was a risk he could not get it done. And he needed to know. All right. Thank you, sir. We appreciate it.
judges: J. Harvie Wilkinson III, Toby J. Heytens, Diana Gribbon Motz